# ADRON M. THOMPSON v. VALCOR E. JARRETT.
## —315 S. W. (2d) 537.

Western Section, Jackson. May 23, 1957.

Certiorari denied by Supreme Court December 6, 1957.

514

William A. Derrington, Jr., and Peeler & Hollis, Camden, for Adron M. Thompson, plaintiff.

A. Bradley Frazier, Camden, and W. H. Lassiter, Huntingdon, for Valcor E. Jarratt, defendant.

AVERY, P. J., (Western Section). This case was tried three times. The first two trials were a consolidation hearing of two suits, one by Thompson against Jarrett, which originated in the Circuit Court of Benton County, and one by Jarrett against Thompson, which originated in the Justice of the Peace Court of Benton County.

The first trial, July 6 and 7, 1955, resulted in a mistrial and as a result of that action, Jarrett filed a motion for a new trial only on the ground that the Court declined to grant his motion for a directed verdict at the conclusion of all the evidence, which motion was overruled and the defendant filed a wayside bill of exceptions.

The second trial, November 29 and 30, 1955, resulted in verdict and judgment for Thompson, in the amount of $2,000 and of course against Jarrett in his case against Thompson. Thompson filed a motion for a new trial upon the ground, among others, that the verdict was inadequate. Jarratt filed motion for a new trial on the ground that the Court erred in refusing to direct verdict for him, and this motion was overruled. The motion of Thompson was sustained by the Circuit Judge and new trial granted. To that action of the Court in setting aside the verdict and granting a new trial to Thompson, Jarrett filed a motion for a new trial on the following grounds:

"(1) The Court erred in sustaining grounds 2, 3, 8 and 9 of plaintiff's motion for a new tiral and granting him a new trial thereon.

"(2) The Court erred in granting plaintiff's motion for a new tiral in the entire case.

"(3) The Court erred in granting plaintiff a new trial as to property damages.

"(4) The Court erred in granting plaintiff's motion for a new trial on the basis that the jury had not taken into account remote contributory negligence, when as a matter of fact the jury had brought in a general verdict, which was a good verdict, and then had erroneously instructed the jury to separate its verdict into property damage and personal injury, so that in effect the Court's action in granting plaintiff's motion for a new trial solely upon the inadequacy of the verdict as to personal injuries is based upon the Court's own error." (Vol. 1, p. 42).

This motion was made in the case styled—Thompson vs. Jarrett, No. 1052, and was overruled after a hearing of juror witnesses' oral testimony. Jarrett presented, had certified and filed two wayside bills of exceptions, one respecting the action of the Court in overruling his motion for a directed verdict, filed March 22, 1956, and one relating to the action of the Court in sustaining Thompson's motion for a new trial.

There was a third trial, July 16 and 17, 1956, in which there was a verdcit and judgment for $1,250 property damage and $7,500 for personal injuries in favor of Thompson and against Jarrett. A motion for new trial by Jarrett was seasonably made, overruled, an appeal

prayed, perfected and granted to this Court, and he has assigned errors.

The record filed in this Court on this last or third trial consists of two volumes containing about 450 pages, and in general the technical transcripts of the records of all three trials are found in Vol. 1 of the record of the last trial. The declaration is in two counts, alleging the wrecking of plaintiff's automobile and permanent and serious injuries to his body. There is no separate allegation in the declaration by which the property damage sought is stated in dollars and cents, but both property damage and physical injury damage are sought within the averments of the declaration and in the amount of $50,000.

The motion for a new trial by plaintiff Thompson, (R. 38, 39, Vol. 1) will be referred to hereinafter, the Order of the Court sustaining same, granting a new trial, and the Order of the Court on motion for new trial by Jarrett. (Vol. 1, p. 41).

The motion for new trial by Thompson was sustained solely and alone upon the inadequacy of the verdict, and grounds 2, 3, 8 and 9 thereof are as follows:

"2. Because the verdict of the jury is so grossly inadequate, in comparison with the injuries actually sustained by the plaintiff and proven, as to evince passion, prejudice or unaccountable caprice on the part of the jury."

"3. Because the damages for personal injury to the plaintiff are so inadequate, in view of the evidence, or conflict of evidence, or from all of the cir-

cumstances, as to plainly indicate that the verdict of the jury was the result of compromise."

"8. Because the judgment is so grossly inadequate as to constitute a miscarriage of justice and to evidence the fact that it was the result of partiality, passion, prejudice, unaccountable caprice, intemperance, or corruption."

"9. Because the amount awarded by the jury for the personal injuries sustained by the plaintiff was so grossly inadequate as to show that it was the result of mistake, misapprehension, oversight or misconduct such as passion, prejudice or partiality on the part of the jury, said award being entirely disproportionate to the injuries which were proven to have been sustained." (Vol. 1, pp. 38, 39).

In Volume 2, at pp. 391, 392 is shown the verdict of the jury and judgment of the Court in the third trial. Motion for new trial by Jarrett is shown on pp. 393 to 402, inclusive.

On hearing the motion by Thompson for a new trial of the second trial, one of the jurors, Noah Jordan, was summoned and testified in substance that the jury discussed the case, including both personal injuries and property damage, and agreed on a verdict of $2,000. The substance of what he said is embraced in his answer to Q. 14 as follows:

"Q.14 Tell in your own words what the jury actually did when you returned the verdict? A. As I seen it the jury gave Adron Thompson a judgment of Two Thousand ($2,000.00) Dollars regardless of what was done with it."

He explained that answer by saying that they discussed about property damage and also physical injury and determined that the $2,000 was all the damage for both items. The Court was concerned about this witness' testimony and interposed several questions, among them the following:

"The Court: Did you discuss what the property damage was and the other damage? A. Yes, sir.

"The Court: Tell what you said and how you discussed it and how the money was to go. A. They argued and had an agreement like this. We wished we could help both of them some.

"The Court: Help both with what? A. Both men. They was both damaged. That is what we done. The way we had the agreement. And finally reached a verdict.

"The Court: I want to know if you undertook to decide what damage was done to that car—that automobile. A. The way I seen it according to the proof the automobile was damaged very bad.

"The Court: Did you discuss it and try to reach what it was? A. Yes, sir.

"The Court: Did you reach what it was? A. Ask some of the rest of them.

"The Court: There is nothing wrong about it. I want to know if you returned a judgment without discussing the damages to the car and the injuries to the man. I want to know it if you did. A. I don't think so.

"The Court: If you didn't, tell what you did. A. We discussed it several different ways.

"The Court: What did you go in there for? What did you hear the case for? No answer.

"Can you tell me? A. To give justice man to man.

"The Court: What did you go in there to consider? No answer.

"What was your purpose in going in there? No answer.

"I want to know what you consider the purpose of going in there? No answer.

"I would love to know? A. I don't know what the other fellows went in there for.

"The Court: What did you go in there for? A. I went in to try to give justice to man according to the law and the evidence.

"The Court: What kind of a case was it? A. Was it a damage case—that is all I know about it.

"The Court: What kind of a case did you actually hear? A. I think that is it.

"The Court: Do you know who the parties to that lawsuit were? A. Yes sir. Adrom Thompson and Jarrett.

"The Court: Who sued who? A. Jarrett sued Thompson and Thompson sued Jarratt.

"The Court: Did you decide which was right—which was negligent and which was not? A. I believe—I am talking for myself—we decided both parties was to blame.

"The Court: Why did you return a judgment against one then and not against the other? A. I don't know but that is what we done.

"The Court: I want to know. A. I am really wanting to find out myself. That is what we done—what I have told you—we done the very best we could.

"The Court: I am not complaining—I want to know? A. I haint—I can't tell you—I have not been satisfied with myself—I didn't sleep none that night." (WB, pp. 6, 7, 8).

Counsel then asked the witness as follows:

"Q.21 Now, then, I will ask you this question again,— when you returned a verdict for Two Thousand ($2,000.-00) Dollars without any regard to division?

"A. That is what I thought." (WB, p. 8).

On cross-examination, he testified that he did not remember the Judge asking the foreman of the jury at the time the verdict was returned for $2,000, how it was divided.

Another juror by name of Clive Corbett testified that the jurors discussed the case and reported to the Court that they could not agree; that the Court directed them to consider the matter further; that they did so and reached a verdict of $2,000 in favor of Thompson. He summed up what he thought the jury did by saying:

"Some of them suggested to give him—he had already we understood got some on the car—give him Fifteen Hundred ($1500.00) Dollars to let finish paying for the car and to give five hundred ($500.00) Dollars for expenses—the expenses for the person." (WB, p. 11).

But he did not remember just what they did say when they returned and made the report to the Court. The

whole substance of his testimony is to the effect that the jury agreed on $1,500 damage to the car and $500 for personal injuries, but made a report of $2,000, the two items being put together.

Carlie Pierce, another member of the jury, was examined and his whole testimony was to the effect that the jurors finally decided and agreed to give $1,500 on the car damage and $500 for personal injuries, and made the whole verdict in round figures of $2,000. His summary of what he meant by his answer to Q.5 on cross-examination, is as follows:

"Q.5 When you went back was anything said about how much for the automobile?

"A. No, I just now said that was talked by the whole jury—give Five Hundred ($500.00) Dollars for him— for his damages and Fifteen Hundred ($1500.00) Dollars for the car. When the vote was put up everybody wanted to give Two Thousand ($2,000.00) Dollars and let's go and the whole thing raised their hand." (WB, pp. 17, 18).

In this bill of exceptions at p. 23, in discussing the matter, the Court made this statement:

"They agreed when they came in and brought in a verdict of Two Thousand ($2,000.00) Dollars and I asked them how they divided it, how they arrived at it. The foreman said we arrived at Five Hundred ($500.00) Dollars for the car and I mean the personal injury and Fifteen Hundred ($1500.00) Dollars for the car. And I said each and everyone? So say each and everyone of you? Every single one spoke. They agree on that."

Again the Court said

"It is my insistence that they reached a verdict of Five Hundred ($500.00) Dollars personal damages and Fifteen Hundred ($1500.00) property.

"* * * I understand—I said it is the personal injury Five Hundred and the Property Damage Fifteen Hundred and by some miraculous calculation that makes Two Thousand."

This witness, Carlie Pierce, in substance stated that he thought both parties were guilty of negligence. The last two questions propounded to him and his answers are as follows:

"Q.4 You thought both parties guilty of negligence?

"A. Yes sir.

"Q.5 You thought the negligence of both parties contributed to the injury involved?

"A. Yes, sir." (WB, p. 24).

An exception was interposed by Mr. Peeler who said: "I don't think he should impeach his own testimony."

The Court then interposed the following:

"I think if this man is testifying to that, he is entitled to a new trial. I think he is entitled to a new trial on all of it. This man said he didn't believe he was entitled to anything—if he had said that there would not have been a verdict." (WB, p. 24).

One Grady Sterling, another member of the jury, was introduced as a witness. The substance of his testimony

is that the first report was that the jurors could not agree. They returned to the jury room and they agreed to $1,500 for the car damage and $500 for personal injuries; that they reported a total of $2,000. The Court suggested that the verdict be separated as to property damage and physical injury damages, and then the jurors reported that they agreed to $1,500 for the car damage and $500 for personal injuries.

Harold Fry, a member of the jury, testified at this hearing on the motion for a new trial, and on direct examination stated that the jury was first "hung" and reported to the Court that: "We couldn't agree". He said Pierce, Corbett, and Jordan at that time wanted to give the man with the truck damages. He was then asked and answered:

"Q.6 After you went back what was said about the lawsuit? A. They decided—they taken a vote and decided on Two Thousand ($2,000.00) Dollars— Fifteen Hundred for the car and five hundred for him.

"Q.7 Was that agreed on in the jury room? A. Yes sir.

"Q.8 After you came out of the jury room and the foreman reported Two Thousand ($2,000.00) Dollars, how did you divide it? A. Fifteen hundred for the car and five hundred for personal damages.

"Q.9 What did the court ask you? A. They asked if we had reached a verdict?

\* \* \* \* \* \* \*

"Q.11 Was there any difference in the verdict reported by the foreman and that agreed upon in the jury room? A. Yes, sir, they was." (WB, pp. 28, 29).

On cross-examination, he was asked and answered:

"Q.2 There was disagreement among the jurors as to whose fault the accident was? A. Yes—they was three that disagreed.

"Q.3 The Court further instructed you and you returned back to the jury room? A. Yes sir.

"Q.4 Did or not some member of the jury make a motion before the jury all in favor of giving Mr. Thompson Two Thousand ($2,000.00) Dollars hold up your hand? A. No, sir, I didn't understand that.

"Q.5 What did you understand? A. They asked all in favor of giving him Fifteen Hundred for the car and five hundred for him.

"Q.6 When the foreman came in he reported a verdict of Two Thousand ($2,000.00) Dollars? To the Judge? A. Yes, sir.

"Q.7 I asked did he or not report a judgment of Two Thousand ($2,000.00) Dollars to the Court? A. The judge asked if we had reached a verdict and he told him we had and he wanted to know what it was.

"Q.8 What did you tell him? A. Fifteen Hundred for the car and Five Hundred for him.

"Q.9 May I ask you did or not the foreman of the jury tell Judge Morris 'We have found for Thomp-

son here and fix his damages at Two Thousand ($2,000.00) Dollars? A. I didn't understand that.

"Q.10 And did or not Judge Morris turn to the jury and say substantially this 'Gentlemen, how do you divide it—this amount?' A. How did you divide it. He asked the question first.

"Q.11 Prior to that time had or not the foreman reported a verdict? A. Yes, sir.

"Q.12 Had he or not reported a verdict of Two Thousand ($2,000.00) Dollars? A. No, sir." (WB, pp. 29, 30).

At the conclusion of the evidence by the jurors and argument of counsel, on the motion by the defendant in the case of Thompson v. Jarratt, No. 1052, the Court entered an Order overruling it. (Vol. 1, p. 43).

The first 43 pages of this Volume is a transcript of the record. Beginning on p. 44 of this Volume, is the bill of exceptions in connection with the last trial.

It is proper for this Court to give consideration to the respective wayside bills of exceptions in the order in which they appear and in considering the bill of exceptions in the first trial to give no consideration to the record in the second trial. If we overrule the assignments of error in connection with the first trial, then we pass to a consideration of the second wayside bill of exceptions of the second trial, giving no consideration to the bill of exceptions in the third trial, unless we overrule the assignments of error in connection with the second trial. Sections 8985, 8986, Williams Code of Tenn. Ann.; Jenkins v. Hankins, 98 Tenn. 545, 41 S. W. 1028;

Barnes v. Noel, 131 Tenn. 126, 174 S. W. 276; King v. Miller, 8 Baxt. 382; National Life & Acc. Ins. Co. v. Atwood, 29 Tenn. App. 141, 194 S. W. (2d) 350; Chickamauga Quarry & Const. Co. v. Pundt, 136 Tenn. 328, 329, 189 S. W. 686; City of Nashville v. Fox, 6 Tenn. App. 653, 657; Railroad v. Scott, 87 Tenn. 494, 497, 11 S. W. 317; General Outdoor Adv. Co. v. Coley, 23 Tenn. App. 292, 131 S. W. (2d) 305.

"The correct practice, under the act of 1875, Ch. 106, carried into the M. & V. Code, secs. 3836 and 3837, authorizing a bill of exceptions to the action of the court in granting a new trial, is when the case finally comes before this court on appeal from the final judgment, at the succeeding trial, to first examine the record of the first trial, so far as it concerns the action of the court in granting the new trial. If the trial judge has committed no error in allowing such a new trial (and very much is necessarily left to his decision, especially where he is dissatisfied with the verdict,) this court will refuse to disturb his action thereon, and will pass to the consideration of the record of the second trial.

"If, on the other hand, the trial judge has committed manifest error in setting aside the first verdict, this court will enter judgment on such verdict, without looking to the record of the succeeding trial or trials." Railroad v. Scott, supra [87 Tenn 494, 11 S. W. 318]; City of Nashville v. Fox, supra; General Outdoor Adv. Co. v. Coley, supra.

With this orderly procedure in mind, we should state that the collision of the automobile and truck involved in this proceeding occurred on a straight stretch of

Highway 70 west of the west end of the bridge across Kentucky Lake over the Tennessee River at New Johnsonville.

For the sake of clarity and convenience in this Opinion, the parties have been and will be referred to by name "Thompson" and "Jarrett".

The declaration alleged that Jarrett owned a 1949 Model 1½ ton Ford truck, with flatbed more than 80" wide, and that on October 9, 1954, at or about 10:30 p.m., he stopped the truck or left it standing on the paved and improved portion of said Highway in the north lane of traffic headed west, said point being outside of a business or residential district; that there were no visible or burning rear light, with no fuses, lighted flares, pot torches, red lanterns or reflectors placed on said highway near said truck as a warning to oncoming traffic.

In the first count, the specific common law negligence alleged is:

(1) Stopping the truck on the paved, improved portion of the highway;

(2) Failing to have a rear light visible for 500 feet and no clearance lights or side markers;

(3) Failing to place near said truck lighted fuses, flares or torches, red lanterns or reflectors so that it could be seen;

(4) Making no effort to prevent an accident when he saw, or by the exercise of reasonable care, could have seen that an accident was imminent.

The second or statutory count of the declaration charges a violation of Section 2690, sub-sec. (a) of the

Code of Tennessee of 1932, relative to leaving a truck parked on the main traveled portion of the Highway outside of the business district, when it was practicable to park it elsewhere. It charged violation of Section 2695, sub-sec. (e) of the Code of Tennessee, 1932, which provides that:

"Every motor vehicle, other than any road roller, road machinery or farm tractor, having a width at any part in excess of eighty (80) inches" shall be equipped with at least the following lighting devices and reflectors:

"1) 2 headlights and 2 amber clearance lights at widest point of vehicle;

"2) 1 red tail light, red or amber stop light, 2 red clearance lamps at widest point of vehicle and 2 red reflectors, one on each side;

"3) On each side, 1 amber side marker lamp near the front, one red side marker lamp at or near the rear, one amber reflector at or near the front, one red reflector at or near the rear, with such clearance lights capable of being visible 200 feet in front of vehicle and 500 feet from the rear.

"4) Failure to comply with the placing of lighted fuses 200 feet ahead of a disabled motor vehicle stopped on the traveled part of the highway, etc."

The defendant filed a plea of general issue and also a plea to each of the counts to the effect that Thompson at the time he was injured was guilty of contributory negligence constituting the proximate cause of his injury in that he was not in the exercise of due care and caution, etc.

530

■ Looking at the evidence given in this first trial, as reflected by the wayside bill of exceptions filed in September, 1955, the substance of the proof of Thompson, the driver of the car, and one of the injured persons, is that he was 24 years old; had worked in the Hudson Motor Co. plant in Detroit; had his military service in the U. S. Air Force four years, getting out in 1954, and lived in Benton County; that the collision occurred at 11:20 or 11:30 at night after he had been over in Humphreys County since 9:30 or 10:00 p.m.; that he went first to a place called "The Hideaway" where he picked up two girls and from there they went to Wilson's Cafe where he got with Harold Loveall; that he carried the girls back to the car the girls came in and that they then went back to Wilson's Cafe to get Loveall's car; that Loveall's car was gone and they started home back into Benton County; that they had crossed the River Bridge coming west when the wreck occurred. He summarized the accident as follows:

"Well I was coming back toward Camden and came across the bridge and as I was coming off the end of the bridge there was a car down the levee that dimmed his lights, so I dimmed my lights, I went on down the road a little piece and then I saw this truck setting over there in my lane, my first impulse was to go around it, I got on the brake and started to pull out and I seen I couldn't get around it because this car was coming toward me, I got back in my lane and I had on the brakes all the while, the wheels was sliding, got pretty close to the truck, my car was sliding out to the left and I was afraid it was going to slide out and hit this car coming toward me, I released the brakes enough to get it under

control and back over in my lane and I hit the truck * * *." (Vol. 1, R. 53, 54).

He fixed the point of collision about 800 or 1,000 feet west of the river bridge. He stated that when he first saw the approaching car he dimmed his headlights and it was "between a half mile and a mile I suppose", and at that time he had not seen the truck but came within about 175 feet of the truck before he saw it; that there were no visible rear lights on the truck that he saw; that the truck was sitting still and his car ran in under the back end of the truck, in which collision he was severely injured and he remembered nothing more until he was in the hospital at Nashville. For the purpose of giving consideration to this wayside bill of exceptions in the first hearing, it is not necessary to refer to the injuries except to say that he was right severely injured.

He stated that soon after the injury, he was sued by Jarrett and that at that trial Jarrett testified that he was with the truck and that it belonged to him. At another point, he said:

"I tried to go around the truck naturally, but I saw that the car was going to hit me if I did, all I could do was to hit the truck, lesser of two evils." (WB 1, p. 19)

In explaining just what happened at the time of the collision, he said:

"I was cutting to the right slightly in order to get back behind the truck, because I had been skidding out into the other lane, I was going to hit the car and I was cutting back into my lane." (WB 1, p. 19)

532

On cross-examination, he stated that he was separated from the Air Force September 10, 1954, and the accident occurred on October 9, 1954. He explained that they sold beer at The Hideaway but that he drank no beer that night at all. He retraced his travel from the time he left home until the accident and his movements during the few hours before the accident occurred and said he was driving 50 to 55 miles an hour when he came over the river bridge, when he first saw the headlights of the oncoming car "a half mile or mile" from him; that there was nothing between him and this oncoming car except the truck which he did not see at that time; that he dimmed his lights as he came off the bridge; that he was looking straight ahead; that he saw the truck, pulled slightly to the left across the center line "about a couple of feet" and that at the time he pulled out to get around the truck, the other car was about 300 feet in front of the truck; that he got back into the righthand lane, put on his brakes; that his car skidded into the truck; that when he first saw the truck, it looked like a log truck. His exact statement is:

"All I saw, looked like a log truck, looked like a log truck setting there, just barely saw it at first, it became more clearly outlined as I came up to it." (WB 1, p. 53).

The next witness for the plaintiff was Lebron Hollingsworth, Sheriff of Benton County. His testimony is to the effect that he had a telephone call informing him of a bad wreck out on that levee and that he went immediately there, arriving before either Loveall or Thompson had gotten away and that Loveall was lying out on the ground beside the car and Thompson was in the car; that

there were long skid marks and that the truck was off down the levee on the right side of the highway going west and had gone over the guard rail, evidently showing that it was knocked over that rail and down the embankment, and the Thompson car had gone into the left guard rail before it came to rest, and finally stopped against the rail; that the skid marks he saw were all on the righthand center of the line looking (west) toward Camden; that the car Thompson was in was a Plymouth and was badly torn up on the front end.

Harold Loveall testified for plaintiff and the summary of what occurred is in his answer to the following question:

"Q. What happened?

"A. As we were coming off the bridge I noticed Mr. Thompson dimmed his lights and there was an approaching car, we went on a little bit further and I saw this truck there with no visible lights, no movement nor anything about it, Mr. Thompson was apparently going to pass it and he pulled back in, slammed on his brakes and we slid down the right hand lane toward the truck and he seen he was sliding out in the left hand lane and he just seemed to let off his brakes or something and started toward the truck, I braced myself with my left hand against the dash board, my right hand toward the car and that is the last thing that I remember." (WB 1, pp. 69, 70).

He estimated that at the time Thompson dimmed his lights, the approaching car, he thought, was about a half mile away. He saw no signals or flares or lights about

the truck, and he estimated Thompson's speed at 50 to 55 miles an hour. He estimated that at the time he first saw the truck, the car approaching from the west was about 300 feet west of the truck.

On cross-examination, he stated that he was interested in the outcome of this suit because he had a suit pending against Jarrett. He said that he could see as far down the road as "Thompson's headlights reached", and that they were about 175 feet from the truck when he first saw it. He was asked much about whether he saw the lights on the rear of the truck and he finally said:

"Q. You did not see them, that is correct, isn't it? A. I said I didn't remember seeing them, I don't know what I saw.

"Q. You don't know what you saw, why don't you know what you saw? A. I was scared mister.

"Q. You were scared, now where did you get scared? A. When I saw that truck and that approaching car.

"Q. Well now, were you looking ahead? A. That is right.

"Q. Did you say anything? A. I don't remember that either." (WB 1, p. 81).

Fred Warren testified for plaintiff and stated that he was driving the car going east at the time of this collision. He was asked to state what he knew about how it happened. He summarized the whole situation as follows:

"I had gotten off from work about 11 o'clock, that is the official time I get off, sometimes I get

off a little early and sometimes a little late, and I was riding in a car pool with two more fellows and we came from Johnsonville to Camden, I came back to get my car and I started back across the river and as I was approaching the bridge going east on 70 highway, I saw a car pull out from behind the truck, he pulled out over far enough in my lane that I could see one headlight, then he pulled back in, as soon as I saw his light pull out, why I started braking my car, right directly after that why the car hit the rear of the truck.'' (WB 1, pp. 92, 93).

He estimated that he was within 300 feet of the truck when he saw the one headlight of the other car. He estimated the other car was closer to the truck than he was. He further said:

''Well, I started—when it hit the car, when I saw the headlights pull out I started braking my car, when he pulled back in I relaxed on the brake kinda I guess, because I thought he had gone back in, when the car hit the truck I started braking the car, the car came on my side of the road and started braking as hard as I could.

''Q. About how close were you to the crash, the point of impact, in your estimation?

''A. Oh, I guess 150 feet or maybe more.'' (WB 1, p. 94).

He stated that he saw two headlights on the front end of the truck but that he noticed no movement of the truck. He further stated:

''As I said before, the car came over in my lane and I started braking my car just as hard as I could

to avoid being in the collision myself, and as a re-result I don't know whether I pulled the car over myself or whether it skidded that way, but I turned around in the road and my car was heading almost back toward Camden, at an angle into the guard rail when I got stopped." (WB 1, p. 95).

The collision of his car with the guard rail damaged it considerably. He estimated his speed when he first observed the lights of the other car at 50 or 60 miles per hour, and estimated the distance that his car skidded to be about 100 feet. He said the car that hit the truck had come to a stop just east of where his car had stopped and was against the opposite side rail; that the two cars, that is his and Thompson's were about 30 or 40 feet apart and his car was 100 feet west of the truck; that when he reached the other car the boys were in it and "the car was afire, it was burning pretty bad at that time, blaze coming up out of * * the air filter had been knocked off the carburetor and the blaze was coming up oh, I guess two or three feet, the hood was knocked off the car, too." He states that he "tried to rouse the boys up" but could not get either of them to say a word. He opened the right door and pulled Loveall out and laid him beside the car and tried to get Thompson out but could not, he was pinned into the steering wheel. He stated that when he saw the headlights on the truck; he assumed the truck was moving toward him and it was in about the center of the right lane. He was asked and answered:

"Q. If he had had his car under control he could have stopped, couldn't he, like you did?

"A. Had he had his car under control he could have stopped, yes." (WB 1, p. 111).

In giving consideration to the assignments of error with respect to the first trial, based only on the assignment that the Court erred in refusing, to instruct the jury, at the conclusion of all the proof, upon motion duly made, to return a verdict in favor of defendant, it is not necessary to go further into the proof.

■ It has been said so many times, in so many cases, that in giving consideration to such a motion, it is the duty of the Court to take into consideration all of the proof, weigh it in the light most favorable to the party against whom the motion is made, disregard all countervailing evidence, draw all reasonable inferences in favor of the opposite party, and if there is any evidence favorable to the plaintiff about which the minds of reasonable men would disagree, the motion would have to be overruled. Harris v. Dobson-Tankard Co., 41 Tenn. App. 642, 298 S. W. (2d) 28; Parrish v. Yeiser, 41 Tenn. App. 690, 298 S. W. (2d) 556, 559; Smith v. Sloan, 189 Tenn. 368, 376, 377, 225 S. W. (2d) 539, 227 S. W. (2d) 2; Henry v. Roach, 41 Tenn. App. 289, 293 S. W. (2d) 480; Goodrich v. Morgan, 40 Tenn. App. 342, 291 S. W. (2d) 610, 613.

Many other cases are to the same effect.

It is the insistence of counsel for Jarrett that the facts testified to by plaintiff and his witnesses constitute a case for the application by this Court of the "Clear Distance Rule" to operate in behalf of Jarratt on his motion for a directed verdict in his favor. He cites the case of West Construction Co. v. White, 130 Tenn. 520, 172 S. W. 301. He states the rule to be:

"That a motorist must not operate an automobile at a greater speed than will enable him to stop within the distance between his automobile and a discern-

ible object obstructing his path. If he so operates his automobile in such a manner, he is guilty of negligence as a matter of law.''

He admits that this rule has been modified by our Supreme Court in the case of Main St. Transfer & Storage Co. v. Smith, 166 Tenn. 482, 63 S. W. (2d) 665, 668, and from that case he quotes the statement of the Supreme Court as follows:

"Adhering to the general rule that it may be negligence in law to operate an automobile through darkness at a rate of speed which will not permit the avoidance of an obstruction disclosed by the rays of the lights with which the automobile is equipped, we are of opinion, and so rule, that exceptional circumstances will render the rule inapplicable, as contrary to the practice and experiences of persons of ordinary caution and prudence. The emergencies and hazards of present-day travel by automobile are many and varied, and we think no arbitrary or universal definition of the circumstances which will render the rule inapplicable is possible. The facts and circumstances of the cases in which the rule is invoked, weighed in the light of observation and experience must control and direct the ruling of the court in each particular case, as in other negligence cases.''

From that opinion counsel suggests that "the assured distance rule is still in full force and effect in Tennessee, unless the plaintiff can bring himself within an exception to the rule", such as the plaintiff being blinded by oncoming lights, going over the crest of a hill, or around a sharp corner, etc.

In the case of Main St. Transfer & Storage Co. v. Smith, supra, there was a large unlighted truck parked below the crest of the hill where, because of the elevation it was not revealed by the lights of plaintiff's car until the car was too close to the truck to be stopped, and this was not held to be contributory negligence as a matter of law. In that case the plaintiff's car was traveling at a very slow rate of speed. In that case there is a further reference to the rule established by the West Construction Co. v. White opinion of Mr. Justice Swiggart where he said:

"The rule formulated and applied in West Const. Co. v. White was no more than an application to given facts of the familiar rule that the test of negligence is whether the action under scrutiny was in accord with the actions of reasonably prudent men under the same or similar circumstances."

In the instant case, it might be inferred from the proof and particularly from the·photographic exhibits, that the lights of an automobile headed west from the bridge across the Tennessee River over which plaintiff had just passed, would be cast in a downward angle due to the bridge elevation. However, it is stated by plaintiff that he put on what we refer to as the dimmer or lower light range as he came over the end of that bridge. He also claims the truck of Jarrett was stopped, had no lights visible from the rear end, etc.; but the undisputed proof, even by plaintiff's witnesses, is that the collision occurred 800 to 1,000 feet west of the west end of the bridge. If he lowered his lights at the point which he claims, and did so because of a car approaching a half mile to a mile away, he could not have seen the truck had it been stopped at the shortest distance mentioned, 800 feet, from the end

of the bridge. If the truck was closer to him at the time he lowered his lights than 800 feet, then certainly the truck was not stopped on the highway at the time of the collision.

It is further insisted by Jarrett that the facts in this case should be determined in accord with the approved statement of this Court, and the Supreme Court in the case of Carney v. Goodman, 38 Tenn. App. 55, 270 S. W. (2d) 572, 575, where in an Opinion by Judge Felts, in deciding a case where a Plymouth Coupe was stopped or parked in front of a business house, standing at an angle in the highway with the rear end thereof about 5 feet on the pavement, with a hill crest about 40 feet south and in front of it, with the east half of the road freshly oiled and slick with oil and rain, and two other motor vehicles, both trucks, one trailing the other at a distance of 150 feet, both traveling 30 to 35 miles an hour, the front truck having stopped because of the parked automobile, the rear truck came on into it because the traffic in the opposite direction prevented him from pulling around it, and after he had jammed on his brakes and tried to stop, the impact wounding a person riding in the rear of the truck by a heavy kettle being thrown forward against him, pinning him between the cab of the rear truck and the kettle, and in which case the owner of the automobile and the owner and driver of the front truck were all sued by the injured person and a verdict directed by the Trial Court in favor of all defendants, was reversed by the Court of Appeals as to the owner of the automobile but sustained as to the owner of the front truck. In that case, Judge Felts discussed the second actor rule, which counsel for Jarrett insists covers the facts of the instant case, as follows:

"There is, however, another line of cases in which it was held that the negligence of one in obstructing the highway by a standing vehicle was superseded by another's negligence in running into such vehicle, and that the latter's negligence was the proximate cause of the accident. Hubbard v. Murray, 173 Va. 448, 38 S. E. (2d) 397; Medved v. Doolittle, 220 Minn. 352, 360, 19 N. W. (2d) 788, and cases cited in Annotation, 131 A. L. R. 564.

"(7) The test of whether a case falls within one line or the other of these cases seems to be this: Did the driver running into the standing vehicle see it in time to enable him by use of due care, to avoid the collision? If he did not, his negligence is merely a contributory cause; if he did, his negligence is the proximate cause. Kline v. Moyer, 1937, 325 Pa. 357, 191 A. 43, 111 A. L. R. 406. In the case just cited the Pennsylvania Supreme Court laid down these two rules:

" '(1) Where a second actor has become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act of negligence, brings about an accident, the first tort-feasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its proximate cause.' 325 Pa. 357, 191 A. 46, 111 A. L. R. 410-411.

" '(2) Where, however, the second actor does not become apprised of such danger until his own negligence, added to that of the existing perilous condition, has made the accident inevitable, the negligent acts of the two tort-feasors are contributing causes

and proximate factors in the happening of the accident and impose liability upon both of the guilty parties.' 325 Pa. 357, 191 A. 46, 111 A. L. R. 411.''

While we agree with the principle laid down by Judge Felts with respect to the second actor rule, we do not find it necessarily applicable in the instant case. In that case being considered by Judge Felts, the declaration therein had charged the negligence of the owner of the automobile to be that of leaving it standing on the paved portion of the highway, (1950 Code Supplement, Sec. 2700.11) when there was apparently no reason why she could not have parked off the paved portion of the highway. The negligence charged to the truck driver was that he failed to keep a proper lookout ahead, failed to come to a gradual stop but stopped suddenly without giving any signal or warning of his intention to stop. In his Opinion, Judge Felts said:

''Seeing the Stamper car blocking his right traffic lane, and being unable to pass it on his left because of southbound traffic, the driver of the Warren Brothers truck was bound to stop, and did stop without a collision. But no witness saw him stop or saw whether he gave any signal or warning of his intention to stop.''

In the instant case, on this second trial, the jury might have inferred from the testimony of plaintiff's witnesses that the truck was parked or was stopped on the highway, and that it was not impracticable for Jarrett, had he intended to stop, to have parked off the paved portion of the highway. This inference is given force by the testimony of one James W. Henry, as hereinafter referred to, who testified for the plaintiff.

We are, therefore, of the opinion that the case of Carney v. Goodman, supra, when applied to the facts of the instant case, supports the action of the Trial Court in refusing to grant a directed verdict for the defendant.

Counsel for Thompson, in respect to the contention of counsel for Jarrett that a directed verdict should have been granted, refers to only one case—East Tennessee Natural Gas Company v. Peltz, 38 Tenn. App. 100, 270 S. W. (2d) 591, the applicability of which goes to the question of the dispute of determinative material evidence and doubt as to the conclusions to be drawn from all the evidence as relates to directed verdicts.

The testimony of the plaintiff strongly indicates some character of contributory negligence on his part, but reasonable men could easily differ or disagree on the question of proximate cause, which is a function for determination by the jurors.

In the light of the proof already analyzed, it was a question for the jury to determine whether or not the proximate cause of plaintiff's injuries was the truck parked or moving so slowly on the levee, with or without visible rear lights, etc., or the high speed of the plaintiff's car and his failure to have it under control, or be on the lookout ahead. The very fact that the jury disagreed is indicative, but not conclusive, of the fact that the minds of reasonable men would disagree about the respective negligence of the parties.

We think the Court was correct in overruling the defendant's motion for a directed verdict in that first trial, and defendant's assignment of error in the first trial is overruled.

We now take up defendant's Assignment of Error in the second trial, based upon his first filed motion for a new trial at the conclusion of all the evidence, which is:

"The Court erred in declining to grant the defendant's (Jarrett's) motion for a directed verdict in favor of the defendant made at the conclusion of all the evidence."

The above motion is shown to have been filed on December 16, 1955. In the bill of exceptions of this second trial, this motion was not included, but it was later made a part of the bill of exceptions by stipulation of counsel and by permission of the Court, on suggestion of diminution, and was produced at the hearing, having been filed by the Clerk of this Court on March 12, 1957.

The Assignment of Error now under consideration is Assignment No. 2, shown on p. 23 of the brief, and confined exclusively to the motion for a new trial on the one ground.

The evidence of the plaintiff and his witnesses hereinbefore set out, adduced at the first trial, is substantially the same as at the second trial, reflected by said bill of exceptions filed March 22, 1956, except as hereinafter expressly referred to. So in connection with this Assignment based upon the same authorities, this Assignment is overruled.

We have hereinbefore stated on pages 2 and 3 of this Opinion [315 S. W. (2d) 539] the motion of Thompson to set aside the verdict rendered by the jury in the second trial, and have set out the grounds of that motion sustained by the trial court on page 3 of this Opinion [315 S. W. (2d) 539]. We have set out on page 1 of this

Opinion [315 S. W. (2d) 538] the motion for a new trial by Jarratt, filed after the Court had granted the motion of Thompson. We will not here repeat either motion.

█ This motion having been overruled, Jarrett filed the wayside bill of exceptions and filed his Assignments of Error numbered 3, 4, 5, 6 and 7, as follows:

"Assignment of Error No. 3.

"The Court erred in granting Plaintiff's motion for a new trial filed December 29, 1955 and preserved on the trial of the cause by Wayside Bill of Exceptions filed March 22, 1956. (Tr. Vol. 1, pp. 38-39-40-41-42).

"Assignment of Error No. 4.

"The Court erred in sustaining grounds 2, 3, 8 and 9 of Plaintiff's motion for a new trial and granting him a new trial thereon in the trial of the cause preserved by Wayside Bill of Exceptions filed March 22, 1956. (Tr. Vol. 1, pp. 38-39-41 and 42).

"Assignment of Error No. 5.

"The Court erred in granting Plaintiff a new trial as to property damages on the trial of the cause preserved by Wayside Bill of Exceptions filed March 22, 1956. (Tr. Vol. 1, pp. 41-42).

"Assignment of Error No. 6.

"The Court erred in asking the jury after they had returned a general verdict in the sum of Two Thousand ($2,000.00) Dollars as to how they divided the personal injury and property damage. (Tr. Vol. 1, pp. 37-41-42 and 43).

546

"Assignment of Error No. 7.

"The Court erred in overruling defendant's motion for a new trial, the basis of which was the Court's error in granting plaintiff's motion for a new trial." (Tr. Vol. 1, pp. 42-43).

We can see no good reason why these Assignments should be considered separately in this Opinion.

In considering these last mentioned Assignments of Error, it will be necessary to refer to the testimony of witnesses, exhibits, etc., introduced as evidence and found in the record in this second trial, other than the plaintiff Thompson, Sheriff Hollingsworth, Harold Loveall and Fred Warren, which we have referred to on pages 12 to 16 inclusive of this Opinion [315 S. W. (2d) 544 to 547].

We have also set forth the substance of the juror witnesses given on the hearing of Jarrett's last motion for a new trial, based upon alleged error of the Court in sustaining Thompson's motion for a new trial, along with certain comments by the Court in this Opinion on pages 3 to 9 inclusive [315 S. W. (2d) 539 to 543], and that will not be further repeated.

The substance of the evidence of J. C. Roe, a Highway patrolman, on behalf of plaintiff, is that on the night of the accident in question, he went to the scene of the collision with Sheriff Hollingsworth; that he saw a Plymouth automobile against the guard rail on the south side of the Highway and a truck down the embankment of the levee on the north side of the Highway; that he ascertained both were travelling in a westwardly direction at the time of the collision and that the car laid down skid marks 105 feet in length in the north lane of the High-

way before its collision with the truck; that there were some 15 or 20 feet between where the collision occurred and where the truck left some skid marks "of an arc" form to where it hit the guard rail and went over the embankment. He talked to Jarrett and smelled alcohol on him. His exact statement is:

"He had the smell of alcohol on him, his actions and his impaired ability of speech was all O.K., but you could smell alcohol on him." (WB 2, p. 63).

He stated that Patrolman Swayne was with him; that there was a distance of 95 feet from the point where the accident occurred and where his truck went over the guard rail, and that the Plymouth car went a distance of 180 feet from the point of impact and came to rest against the south guard rail on the road. He identified the photographs made of the highway at and near the point of collision and filed them as Exhibits 1, 2, 3, 4, 5, 6, 7 and 8 to his testimony on cross-examination and also filed Exh. 1 on his re-direct examination, which is the same as Exh. 12 to the deposition of Scott.

The first 6 of the above are identical exhibits and numbers to the deposition of Scott. Exh. 7 is the same as Exh. 9 to Scott's deposition and Exh. 8 is the same as Exh. 10 to Scott's deposition.

These photographs are very clear generally and show the referred to skid marks on the highway, the point of impact, the guard rails where the truck went over the embankment, and the automobile and truck after the collision. They were made by the witness Scott and the ones exhibited by Roe were identified properly by him as far as what they show with respect to the involved accident, as being accurate.

548

Exh. 7 to Roe's testimony is the same as Exh. 9 to Scott; and Exh. 8 to Roe is the same as 10 to Scott, and shows the Plymouth car. Exh. 1 on re-direct to Roe is the same as Exh. 12 to Scott and shows the involved truck.

The condition of the automobile, as revealed by these photographs, plainly shows that there was a tremendous impact between the front end of this automobile and the truck. The witness Roe testified that the clearance light, the tail light, the headlights and the parking lights, together with the reflectors on the rear end of the truck, were intact. He stated that he examined the lighting arrangement of the truck. He stated that the photographs were made by Mr. Scott who was not in uniform at the time but that no photograph of the skid marks made by the car traveling in an easterly direction were made. He stated however, that he saw them. He also said that he saw this car that was traveling in the easterly direction that night; that he saw no lights burning on the truck that night, but that Mr. Jarrett wanted to turn the light switch on to show that they were burning and that he, Roe, advised Jarrett not to put the switch on because the gas was running out of the truck and the battery was still intact. That he did not smell alcohol on Thompson or Loveall, but that he did not come in contact with their bodies, and that Thompson was vomiting.

At this second trial, Loveall stated that he had no interest in the outcome of the lawsuit and was asked:

"Q. You have been settled with yourself?

"A. Yes, sir." (WB 2, p. 89).

The question asked about his settlement was objected to, but the Court overruled it and an exception was noted.

He testified that he and another boy went from Benton County to Humphreys County in his car and after he got with Thompson he told the other boy to drive his car back. (WB 2, p. 90). He testified that he felt like Thompson was driving 50 to 60 miles per hour but he did not know whether the speedometer was broken on Thompson's car and did not notice it. (WB 2, p. 97). He testified that the car hit the truck with great force (p. 99); that he saw the truck some 200 or 300 feet before the impact; that in his opinion, with Thompson's headlights dimmed, he could see 250 or 300 feet, but that his statement was purely an estimate. (WB 2, pp. 117, 118).

A summary of the evidence in behalf of Thompson is that he and his friend, Howard Loveall, were in the Thompson car, driven by Thompson, traveling in a westerly direction, and when he came off the west end of the bridge across the Tennessee River at New Johnsonville, his speed was 50 to 55 miles an hour. They were headed toward their home about midnight. There was a car approaching from the opposite direction ½ mile to a mile away when Thompson dimmed his lights. The only obstruction between these two lighted cars was a truck standing headed west 800 to 1000 feet west of where Thompson had dimmed his lights, which was not seen by Thompson until he was within about 175 feet of it. He pulled slightly to his left with his first thought of going around the truck, but concluded that he did not have time to do so before meeting the oncoming car. He put his brakes on to get back into his proper traffic lane, put on his brakes again and could not stop until he hit the

truck; that both he and Loveall were render unconscious and knew nothing that happened after the impact. Thompson was single, about 23 years of age, at the time of the accident and had only been out of military service a short while prior to which time he worked in an automobile factory in Detroit. He had finished two years in High School.

Thompson received a broken leg, broken teeth, and several cuts in his face. He became conscious in a hospital in Nashville. His broken leg was put in traction, also operated on, and a steel pin inserted in this leg bone. He was advised by doctors that he would have to have another operation about the following December. He was in the hospital two weeks at that time and returned frequently. A brace was made for him extending from his waist to his foot, which he wore several months. He was driving a 1954 Plymouth Sedan which the record shows was worth about $1,800 before the collision and about $150 thereafter, it being practically destroyed.

The evidence and exhibits by Jarrett are to the effect that he and Max Pritchard were together in the truck owned by Jarrett on the night of the involved accident and had been over in Humphreys County. They were on their way back home in Benton County and had crossed the Tennessee River bridge at New Johnsonville, with Jarratt driving, and had reached a point some 800 to 1000 feet west of the west end of the bridge and were traveling at 30 to 35 miles an hour, with all the lights burning, both front and rear; that before they crossed the bridge they last stopped at the Lucas Harbor, at which point Jarrett last noticed his rear lights burning. The truck was struck with a heavy force in the rear and the

impact knocked it over the guard rail completely off the levee, turning it over. Jarrett got out of the truck first and then helped Pritchard out. Pritchard momentarily "blacked out" a time or two while he crawled from under the truck to the top of the levee; that the last stop the truck made was at Lucas Harbor at the east end of the river bridge where only Jarrett got out of the truck for a few minutes; that the headlights on the truck were burning at the time of the impact.

Other than the two men in the truck and the two in the car, the only other eye-witness was the driver of the car headed east who was alone, and whose name was Fred Warren. The substance of his statement is that he was traveling east at a speed of 50 to 60 miles an hour, headed toward the bridge over the Tennessee River and he was within about 300 feet of the involved truck and saw a car pull out from behind the truck into his lane and he could see one headlight, when Warren began to put the brakes to his car. The car that had pulled from behind the truck then pulled back in behind the truck and directly after it pulled in behind the truck, it struck the truck in the rear. When it hit the rear of the truck he put on his car brakes harder and that the car which had hit the truck came over on his side of the highway, or the south side, and then in Warren's effort to stop his car by a forceful braking, he either turned across the road and stopped with its front against the north guard rail or he turned it in that fashion; that the car that hit the truck came on and crashed into the south guard rail where it stopped, and the truck went over the north guard rail and down off of the levee. He estimated that he stopped about 150 feet from where the impact occurred and that his car and Thompson's

car were about 30 to 40 feet apart afterwards and his car was about 100 feet west of the point where the truck came to rest. Both Thompson and Loveall were unconscious and in Thompson's car when he got to it and the flames were coming up out of the air filter or carburetor 2 or 3 feet in height. He tried to rouse Thompson and Loveall but could not do it and then he pulled Loveall out of the car and laid him on the ground beside the car and tried to get Thompson out but Thompson seemed to be pinned under the steering wheel. Warren said he saw the headlights of the truck facing him and that he presumed the truck was moving toward him. Warren also stated that if Thompson had had his car under control, he could have stopped.

The testimony of apparently disinterested witnesses is somewhat contradictory as to whether there was some odor of alcohol detected on the breath of the involved parties. The witness Loveall admitted that he had drunk two or three bottles of beer that afternoon and there was one witness who stated that he thought he smelled some alcoholic odor on the parties who were in the truck. The disinterested witnesses' testimony clearly shows that Thompson's car left skid marks on the highway in a continuous fashion for 105 feet before the impact; that from the point where the impact occurred to where the truck stopped after rolling down the embankment was 95 feet; and the point where Thompson's car stopped against the south guard rail was 180 feet west of the point of its contact with the truck. These measurements were made by Highway Patrolmen, one of whom was Sgt. Scott who made the photographs filed and identified as exhibits to the testimony of Scott and Roe at a time when he was off duty.

The photographic Exh. 1 to Scott's testimony and the same exhibit to the cross-examination of Roe, shows that the skid marks laid down by the Thompson car indicated that two wheels of the car left the direct or straight laid down skid marks, the left one going across the center line of the highway just at about the point of collision. This same photographic exhibit and others show that the truck made certain skid marks at a time when the skid marks laid down by the car were divided, which shows that the car did not center the rear of the truck at the time of impact. These Highway Patrolmen, Roe, Scott and Swayne, testified rather specifically about distances where the two involved vehicles and the car of Warren stopped; how far they skidded, except Warren's, and their relative positions after the collision.

A witness, Howard Fish, who is a court reporter, testified for Jarrett in an effort to impeach their testimony by showing certain contradictory statements made by Loveall and Thompson while they were in the hospital at Nashville, from their statements on the witness stand. The Court sustained the exception made by counsel for Thompson to the questions propounded to this witness about what Loveall had said, for the reason that Loveall had said that he did not remember whether he made such statements or not. These questions propounded to this witness about the statements made by Loveall, will be found at pp. 149 and 150 of WB 2. The Court permitted the witness to answer the questions propounded to him about what Thompson had said. (WB 2, pp. 149 to 152 inc.).

With reference to the statement of this witness about what Thompson said, the witness, after stating what his

qualifications were, said he went with Mr. Cornelius, an attorney, out to the hospital where both Thompson and Loveall made statements, which he took down in shorthand and later transcribed. The questions propounded to this witness and his answers are:

"Q. Now I will ask you if on that occasion and in answer to a question by Mr. Cornelius, which was, 'And you all started to pass it or what?' And if he didn't answer, that is Mr. Thompson, 'the truck didn't have a tail light to the best of my knowledge and it was traveling about 10 miles an hour and I hit him.' That is correct, isn't it?

"A. Yes, sir, that statement was made.

"Q. And I will ask you if in answer to a question by Mr. Cornelius, which was, 'About how fast were you going?' If he didn't answer it, 'I guess I was going—I don't know really, I didn't notice the speedometer, as a matter of fact my speedometer was not working because it made a noise, crank, crank, crank, so I disconnected it the day before', that is correct, is it?

"A. Yes, sir." (WB 2, pp. 152, 153).

The record reveals no statement of the condition of the speedometer on the car after the collision.

There is nothing in the record which indicates that either the driver of the truck or of the car was under the influence of any alcoholic beverage. The boys in the cad had been to several night spots with some girls over in Humphreys County and the two men in the truck had been up to some farmer's home in Humphreys County, ostensibly for the purpose of Jarrett trying to locate a

2-speed transmission backend for his truck which he said that on information he understood this farmer had, but found no one at home.

Ray Coleman, an operator of a service station in Huntingdon, Tennessee, testified to the effect that Jarrett was a customer of his and had been for some time; that he was familiar with Jarrett's truck; that on September 1, 1954, he had serviced that truck and that he put 30 feet of wire, 4 clearance lights and a tail light of the approved type on the truck, and that these lights were correctly installed, one of the clearance lights being placed at each corner of the truck bed. He stated that the truck had reflectors on it—two in number he thought—and that they were located on the bed runners in the rear. The clearance lights were installed so that they burned when the truck's "parked lights or the headlights either one on"; that the tail light also had a brake light on it which was working at the time he installed these lights. This witness further stated that Jarrett broke the tail light backing into a cotton platform, knocking the bolt out of it, and he replaced that and, as he remembered, that was about the 8th day of October, but made no charge for replacing that tail light bolt. On that occasion he checked the tail light and it was burning. He stated that he did not know if the lights were burning at the time of the collision.

Lawrence Garrett says that he was a partner of Ray Coleman in his service station business known as Court Square Service Station, where he had been working for about three years; that he had known Jarrett approximately fifteen years; that Jarrett was a customer of the service station. This witness saw Jarrett the night of the

accident about 8 o'clock and he serviced this truck, and said that when Jarrett pulled away he noticed that the headlights and the tail lights on the truck were burning.

One of the Highway Patrolmen testified that the surfaced portion of this Highway where the accident occurred was 23 feet, 6 inches wide; that it was 19 feet 10 inches from the center of the paved portion to the guard rail on the south side of the levee; that the distance between the south guard rail and the south margin of the paved surface of the road was 8 feet, 6 inches.

In this second trial, the deposition of one James W. Henry, taken upon notice on the 5th day of March, 1955, was read, as witness for Thompson, and is the same deposition of this witness that was read as evidence in behalf of Thompson in the first trial. It is in substance that on the night of this accident he was over at Lucas Harbor and noticed a man named Bell asleep in a booth. He took Bell in a car that belonged to some girl and brought him across the river to his home near Camden; that as he came across the river and on toward Camden he says he saw a truck standing, or moving very slowly, on the levee at the west end of the river bridge over the Tennessee River and that he did not see it until he was close up to it, pulled around it, brought Bell on to his home, turned around and went back toward Lucas Harbor, having been gone not more than 20 minutes from Lucas Harbor and the wreck had occured near where he says he saw this truck. He says that he got to that point before any Highway Patrolman was there, saw the boys that were in the Plymouth car, drove on over to Lucas Harbor and informed some people about the collision, came back in this same car, left it there at the scene of the collision

and came to Camden in the ambulance that brought the injured boys to the Doctor's office; that he told nobody that he had left the girl's car at the scene of the accident and he did not know how it got away from there except by information.

It is noted that the Trial Judge pronounced judgment on the verdict of the jury, the pertinent part of which is as follows:

"This cause came on to be heard on this 29 day of November, 1955, before the Honorable E. A. Morris, Judge, and a jury of good and lawful men to-wit:"

(Here the names of the jurors are set out, their respite at the close of the day, etc.)

"and the evidence having been concluded and having heard the charge of the Court and argument of counsel, retired to consider its verdict, and after due consideration, the aforesaid jury returned into open Court and reported upon their oaths they found the issues joined in favor of the plaintiff and assessed his damages in the sum of Two Thousand ($2,000.00) Dollars.

"Thereupon the Court asked the jury how they divided the personal injury and property damage, the jury reported $1,500.00 property damage and $500.00 personal injury damage. The Court then asked, so say you all, to which all answered yes.

"It is, therefore considered by the ·Court that the plaintiff have and recover of the defendant $1,500.00 as property damages and $500.00 as personal injuries, and the costs of the suit, for all of which let execution issue." (Tr. Vol. 1, p. 37).

The fact that the Court sustained Thompson's motion for a new trial on grounds 2, 3, 4, 8 and 9, copied on page 3 of this Opinion [315 S. W. (2d) 539], all alleging that the verdict was so inadequate as to indicate that it was the result of mistake, misapprehension, oversight, misconduct, such as passion, prejudice or partiality on the part of the jury, clearly shows why the Court set the verdict aside as plainly as if he had said so in so many words. The only other expression of the Court is found in his colloquy with the juror, Carlie Pierce, and counsel for Jarratt, quoted on page 7 of this Opinion [315 S. W. (2d) 541].

At this point, giving consideration to the Assignments of Error by Jarrett with respect to the action of the Court in sustaining Thompson's motion for a new trial, the law applicable to a decision by this Court is found in Sec. 27-108 to 27-112, T. C. A., of which Sec. 27-108 is as follows:

"It shall be lawful for the appellant to assign for error that the judge in the court below improperly granted or refused a new trial therein, and the appellate court shall have power to grant new trials, or to correct any errors in granting or refusing the same."

The questions before us are:

(1) Is there any evidence in the record of the second trial to support the verdict of the jury?

(2) Was the verdict of the jury the result of partiality, passion, caprice, or other misconduct so as to render it improper?

(3) Did the Court err in setting aside the verdict and granting a new trial to the plaintiff Thompson?

Certainly, the answer to the first question is in the affirmative. The correct answer to the second is in the negative. The correct answer to the third is in the affirmative. This case presents a clear cut state of facts which required the Court to charge the law with respect to remote negligence upon the part of plaintiff and its effect, if the jury found such to exist, upon the amount of damages to be awarded.

The statements of the plaintiff and his witness, Loveall, that he dimmed his lights ½ to 1 mile away from an oncoming car; the photographic exhibits; the evidence with respect to skid marks on the highway, their position and length; the distance the car traveled after it hit the truck; the location of each vehicle when it came·to rest; the testimony of the defendant and his witnesses,—all this taken together and given in consideration to the jurors under proper charge of the Court with respect to remote contributory negligence which did not constitute a part of the proximate cause of the injury, which charge the Court correctly gave, together with the examination of the juror themselves, and the further fact that the jury in the first trial disagreed completely and the jury at the second trial gave only a $2,000 verdict for plaintiff, and with the record revealing that the jury after the third trial and after it had the Court's original charge, and after giving some consideration to the issues, returned to the court room and the foreman said:

"Foreman: Judge there is a question we want to ask you in this case, can we find the boy partly to

blame in this accident, and if we do, what should we do about it?'' (Tr. Vol. 2, p. 389).

clearly indicates that each of the three juries in each of the three trials were of the opinion that there was some degree of negligence on the part of both the plaintiff and defendant and that the negligence of the plaintiff was such that the amount of the recovery in his behalf should be mitigated or reduced on that account from such amount as he would have been otherwise entitled to receive.

We think this case is governed by the decision of the Supreme Court in the case of Chesapeake, Ohio & S. W. R. Co. v. Higgins, 85 Tenn. 620, 622, 4 S. W. 47, and in the case of Jenkins v. Hankins, 98 Tenn. 545, 41 S. W. 1028. In the Railroad case, the Court in an Opinion by Chief Justice Turney, had under consideration the very question raised in this case, that is, whether or not, based upon the wayside bill of exceptions preserved of the second trial in the instant case revealing the record and the transcript of the technical record of that trial, this Court should reinstate the verdict of the jury. We have quoted the latter part of Chapter 106 of the Acts of 1875 as the applicable law in such case, and commenting upon this same statute and under similar circumstances, the Court said [85 Tenn. 620, 4 S. W. 48]:

''The effect of this satute is simply to give to this court the same power to reverse for error in granting new trials, and enforce verdicts improperly set aside, that it has always had to reverse judgments rendered upon improper verdicts. The consideration of the question in the record arising under this statute is just the same as it would have been had the court

refused to set aside the verdict at the instance of the plaintiff, the defendant resisting, and the plaintiff had appealed. To be more explicit, we try the case upon the first record just as if the case had come to us on appeal of plaintiff. Ignoring the fact that the verdict and judgment on a new trial was $5,000, and looking alone to the fact that the verdict for $500 is before us, we look to the facts to ascertain whether the verdict was authorized."

In that case, Justice Turney further said:

"The facts do not make a [strong] case for the plaintiff, the accident being such as would in all probability have happened to any engine. The verdict of the jury for $500 does not evince passion, prejudice, or corruption authorizing the court to set it aside. If it shows feeling at all, it is sympathy for the widow who sues."

In that case, the verdict was set aside upon the application of the plaintiff. It was restored by the Supreme Court.

In the case of Jenkins v. Hankins, supra [98 Tenn. 545, 41 S. W. 1029], the first trial resulted in a verdict for the plaintiff of 1¢ which was, over the objection of the defendant, set aside by the Circuit Judge and a wayside bill of exceptions filed. The second trial resulted in a verdict for the defendant which was also set aside upon plaintiff's motion. The third trial resulted in a verdict for $500. The Supreme Court, under authority of the very Act invoked in the foregoing case and which, as aforesaid, is embodied in Sec. 27-108, T. C. A., in Opinion by Chief Justice Snodgrass, said:

"It is not within the exercise of the legitimate power of the circuit judge to set aside verdicts as trifling or excessive, unless they appear to be the result of passion, prejudice, corruption or capricious action on the part of the jury. It will be observed that this particular verdict was set aside by the circuit judge because, in his opinion, it was 'against the evidence'; and it is insisted that in such case he has exhibited dissatisfaction with the verdict, and his dissatisfaction cannot be questioned if there were evidence pro and con considered by the jury, and by him in his action setting it aside. But this dissatisfaction [of a circuit judge, which appearing here, will invalidate a verdict], must be as to the finding upon an issue. If there was evidence pro and con, and an issue which was found in favor of one of the parties, and set aside at the instance of the other, the rule is applicable, but it has no application to the question of the amount. Tennessee Coal, Iron & R. Co. v. Roddy, 85 Tenn. 400, 5 S. W. 286; Turner v. Turner, 85 Tenn. 387, 3 S. W. 121. It must be remembered that in this case the issues were found in favor of the plaintiff, and the verdict was set aside, not on the motion of the defendant, but on the motion of the plaintiff himself, who thought the amount was too small. The declaration, therefore, that it is 'against the evidence', although in general terms, can have no other meaning than that the verdict was not sufficiently large, in the opinion of the court. The Turner Case, last referred to, though cited by counsel of defendant in error to the contrary, expressly decided that it was not the duty of the circuit judge to set aside such a verdict

if he was dissatisfied with it. In that case there had been a judgment against the defendant, and the court had expressed dissatisfaction with it, which was an expression of dissatisfaction as to the finding upon the issues. This court reversed it expressly for this reason, but, repeating the rule which had been announced in the Roddy Case, and referring to that case said: 'We have held at this term that where in an action for damages for tort, the circuit judge has expressed dissatisfaction as to the amount of the verdict, which he, nevertheless, let stand, we do not reverse, because, notwithstanding such dissatisfaction, it was his duty to let such verdict stand, unless it was so excessive as to indicate passion, prejudice, corruption, or other improper influences operating to produce it, of which we could judge from the record as well as he. But the rule now asserted was emphasized in that case, that where the dissatisfaction is not with the amount, but the fact of the verdict, it will not be allowed to stand.' This distinction is perfectly obvious. It is clear in this case that it was not dissatisfaction with the fact of the verdict, because the plaintiffs who moved to set it aside had obtained it, and had obtained all he wished, except the amount he wished; and therefore it is clear that his dissatisfaction, and that of the judge who allowed his motion, was with the amount, and not the fact, of the verdict. The case has to stand, therefore, or fall upon the right of the circuit judge to set this verdict aside because it had been the result of influences indicated. The record setting aside does not assume that, in the opinion of the judge, it is indicated either passion, prejudice, corruption, partiality,

unaccountable caprice or any improper influences. And if it can be assumed that he thought so, and did not express that as the reason, which is the most favorable assumption to be taken to uphold the action of the circuit judge, then, as said in the Turner Case, *we can determine this question as well as he; and as decided in the Higgins Case referred to, it is our duty to do so."* Jenkins v. Hankins, 98 Tenn. 545, 550-552, 41 S. W. 1028. (Emphasis added.)

There seems to be nothing in the record in the instant case that indicates the Trial Court was dissatisfied with the jurors' determination of the real issues at the time the verdict was given to the Court. The dissatisfaction seems to have grown out of an examination of the jurors on the plaintiff's motion for a new trial. Some of these jurors were given a somewhat rigid examination by both court and counsel. Some of them stated that the only purpose they had in rendering the verdict as they did was to try ''to do justice between man and man''. They all agreed that the verdict was for a total of two thousand dollars. When the verdict was returned, as hereinbefore shown in this Opinion,—though there was no charge in the instant case with respect to returning a verdict for property damage and a separate verdict for any amount of personal injury damage, the Court inquired of the foreman as all the jurors stood before him, as hereinbefore shown,—''How They Divided The Personal Injury and Property Damage. The Jury Reported $1500.00 Property Damage And $500.00 Personal Injury Damage. The Court Then Asked, So Say You All, To Which All Answered Yes.'' (Vol. 1, p. 37). See case of Morrow v. Drumwright, 202 Tenn. 307, 304 S. W. (2d)

313, judgment on verdict, in an Opinion by Justice Swepston.

It seems to us no necessity to go further with an examination and opinion with respect to the last trial. We are convinced that the Court should have permitted the the verdict of $2,000 to stand and that he erred in setting it aside.

In the case of General Outdoor Adv. Co. v. Coley, 23 Tenn. App. 292, 131 S. W. (2d) 305, 309, where this Court had under consideration the determination of the assignments of error based upon a wayside bill of exceptions preserved in that case, in an Opinion by the late Judge Anderson, he said:

"Experience has proven beyond a doubt that, generally speaking, the wisest course is to pass on what is necessary to dispose of a controversy and then stop."

The assignment of error was sustained with respect to the action of the Court in refusing to direct a verdict for the defendant in the trial where the wayside bill of exceptions had been preserved.

In the case of Railroad v. Scott, 87 Tenn. 494, 496, 11 S. W. 317, 318, in which there was under consideration a bill of exceptions preserved at the first trial, the Court said:

"If, on the other hand, the trial judge has committed manifest error in setting aside the first verdict, this court will enter judgment on such verdict, without looking to the record of the succeeding trial or trials."

The Assignments of Error by counsel for Jarrett with respect to the action of the Court in setting aside the verdict of the jury of $2,000 at the conclusion of the second trial of this case, are sustained, the verdict of the jury in that trial of the case for $2,000 is reinstated, and judgment will be rendered thereon in this Court in favor of the plaintiff, Adron M. Thompson, against the defendant, Valcor E. Jarrett, for that amount, together with interest thereon from the 1st day of February, 1956. This case is reversed and the costs of the first two trials in the Lower Court will be taxed to and adjudged against the defendant, Jarrett, and the costs of the third trial, together with all costs in this Court will be taxed to and adjudged against the plaintiff Thompson. Judgment will be entered in accord with this Opinion.

Carney and Bejach, JJ., concur.